NORMAN LEONARD and MARJORIE LEONARD, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Leonard v. Commissioner
Docket Nos. 5868-78, 5895-78, 5907-78, 5925-78, 5937-78, 6161-78, 7040-78, 7042-78, 7043-78, 10995-78, 11750-78, 8189-79, 8190-79, 8192-79, 8195-79, 9008-79, 9013-79, 9255-79, 9256-79, 9257-79, 9264-79, 13128-79, 13129-79, 10888-80, 10889-80, 11655-80, 11657-80, 11665-80, 11672-80, 14472-80, 15477-80, 16196-80.
United States Tax Court
T.C. Memo 1985-51; 1985 Tax Ct. Memo LEXIS 581; 49 T.C.M. (CCH) 644; T.C.M. (RIA) 85051; January 31, 1985
Stephen Ravel, for the petitioners. David L. Denier, for the respondent. SCOTT *2 MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Deficiency
in
Additions to Tax Under
Name of Petitioners
Years
Income Tax
Sec.6653(a)
Sec.6651(a) [2]
Norman Leonard and
1974
$23,327.00
$1,166.00
Marjorie Leonard
1975
10,543.00
1976
6,703.00
Leonard Trust: Robert
1974
16,038.00
802.00
Dunnett, Et Al.,
Trustees
1975
4,439.00
Andersen Trust: Robert
1974
3,903.00
195.00
Dunnett, Et Al.,
Trustees
1975
1,073.00
Patsey Trust: Robert
1974
2,163.00
108.00
Dunnett, Et Al.,
Trustees
1975
711.00
Benjamin O.
Andersen and
1974
5,996.00
300.00
Kay M. Andersen
1975
3,166.00
1976
6,132.00
Gladstein Trust: Robert
1974
18,938.00
947.00
Dunnett, Et Al.,
Trustees
1975
5,330.00
Frank M. Robinson
1974
26,604.00
1,330.00
1975
9,850.00
1976
12,980.00
Robert S. Muehlenbeck
and
1974
2,271.00
114.00
Carolyn T.
Muehlenbeck
1975
5,988.00
Thomas N. Scortia
1974
16,585.00
829.00
1975
10,460.00
1976
9,660.00
Edward O. Thorp and
1974
20,206.00
1,010.00
Vivian S. Thorp
1975
1,025.00
1976
19,304.00
Richard Gladstein and
1974
22,870.00
1,168.00
$2,000.00
Caroline Gladstein
1975
7,412.00
1,853.00
1976
8,097.00
2,024.00
MISAT Development
FYE 10/31/75
36,940.13
Corp.
FYE 10/31/76
63,803.00
6,380.00
FYE 10/31/77
3,927.00
982.00
Jack Froom M.D.
FYE 1/31/76
62,519.74
Medical Corp., A
California Corp.
Michael Gurdin and
1976
201,699.00
Marlene Gurdin
Meyer Zeiler and
1976
356,425.00
Floria Zeiler
*582 *646 The issue for decision is whether each of petitioners is entitled to deduct in each of the years in which falls the end of the years 1974 and 1975 of L.C. Properties Partnership a loss from that partnership. The partnership loss in each of the years 1974 and 1975 resulted primarily from a claimed interest deduction which respondent disallowed to the partnership. [3]
*647 FINDINGS OF FACT Voluminous facts have been stipulated and are found accordingly. We will only recite the portion of these stipulated facts that we consider necessary *583 to an understanding of our opinion. [4]
*584 Each of the individual petitioners at the time of the filing of the petition in this case resided in California. Each of the trust petitioners at the time its petition was filed had its legal address in California. The address of *5 each of the corporate petitioners was in California at the time its petition in this case was filed. However, MISAT Development Corp. is a New York corporation. Norman and Marjorie Leonard filed joint Federal income tax returns for the calendar years 1974, 1975 and 1976, as did Benjamin O. and Kay M. Andersen, Edward O. and Vivian S. Thorp, and Richard and Caroline Gladstein. Robert S. and Carolyn T. Muehlenbeck filed joint Federal income tax returns for the calendar years 1974 and 1975. For the calendar years 1974, 1975 and 1976, petitioners Frank M. Robinson and Thomas N. Scortia each filed individual Federal income tax returns. For each of the calendar years 1974 and 1975, petitioners Leonard Trust, Andersen Trust, Patsey Trust, and Gladstein Trust each filed a Fiduciary income tax return. Petitioner MISAT Development Corp. filed corporate Federal income tax returns for its fiscal years ending October 31, 1975, 1976 and 1977, and filed *585 an amended return for its fiscal year ending October 31, 1975. Jack Froom, M.D., Medical Corp. filed a corporate Federal income tax return for its fiscal year ending January 31, 1976. Michael M. and Marlene J. Gurdin filed a joint Federal income tax return for the calendar year 1976, as did Mayer and Floria Zeiler. A document entitled "L.C. Properties Partnership Agreement" was prepared in the law offices of Mr. Harry Margolis, and this document was signed at some time by or *6 on behalf of each of petitioners. [5] The document provided that L.C. Properties Partnership (hereinafter sometimes the partnership) shall "refer to the partnership created under this general partnership agreement." The document provided as follows with respect to capital contributions: The partnership shall be initially funded by an aggregate contribution of capital in the sum of Five Hundred Thousand Dollars ($500,000.00). The initial capital contribution of each partner shall be as follows: NAME
DOLLAR AMOUNT
Patsey Trust
$ 10,000.00
Frank M. Robinson
50,000.00
Thomas N. Scortia
50,000.00
Edward O. Thorp
25,000.00
Dr. Meyer Zeiler
50,000.00
Jack Froom, M.D., Medical Corp.
95,000.00
MISAT Development Corp.
62,000.00
Andersen Trust
15,000.00
Erhard Trust
20,000.00
Gladstein Trust
44,000.00
Dr. Michael M. Gurdin
20,000.00
Leonard Trust
39,000.00
Norman Leonard
10,000.00
Robert S. Muehlenbeck
10,000.00
TOTAL
$500,000.00
*586 Each partner's capital contribution shall be fully paid on or before December 31, 1974. The capital interest of each partner shall consist of the capital invested as of the end of each calendar year. No partner shall be required to make additional contributions to the capital of this partnership and no partner shall be allowed to make a voluntary contribution to capital without the written consent of all other partners. *7 No portion of the capital of the partnership may be withdrawn at any time without the express written consent of all partners. No partner shall be entitled to interest on his contributions to the capital of the partnership. The partners of this partnership may receive property other than cash in return for their capital contribution. [6]
*587 *8 The agreement provided that profit or loss was to be shared by each partner in proportion to his capital contribution. It provided that no partner should be entitled to salary or other compensations for his services for the partnership business unless approved in writing by a majority of the partners and carried general provisions about partners acting on behalf of the partnership. The agreement provided that no partner shall assign, sell, mortgage or hypothecate his share in the partnership or its profits or capital without prior written consent of all partners. It contained a provision with respect to dissolution of the partnership and the return of capital contributions upon termination, and provisions for expulsion of a partner. The partnership agreement provided that no partner shall engage in certain specified activities for the partnership, primarily financial activities, without the prior written consent of three of *9 the partners, one of whom must be Robert S. Muehlenbeck or Jack Froom, M.D., Medical Corp. Mr. Muehlenbeck was, at the time the partnership agreement was drafted, an associate in Mr. Margolis' law firm. The partnership agreement was signed *588 on behalf of Jack Froom, M.D., Medical Corp. by Ronald H. Adolphson, who at the time was an employee of Mr. Margolis' law firm. The purpose of the partnership was stated to be to acquire, own, hold for investment, improve, lease, sell, sell and lease back, exchange, transfer or dispose of business, residential and income producing properties, and to engage in any and all general business activities related or incidental thereto. The stated commencement date of the partnership was October 1, 1974. A document entitled "Financing Agreement" which stated that it was entered into on December 15, 1974, between World Entertainers Limited, a Bahamian corporation (WE), and L.C. Properties Partnership was signed on behalf of the partnership by Robert S. Muehlenbeck, partner. There appears on the document a signature on behalf of WE which reads "Lee Bing Chuen, Director." This document states in part as follows: WHEREAS, Borrower wishes to obtain financing in order to purchase land located in Washoe County, State of Nevada, U.S.A., as well as a 214 unit apartment project to be constructed thereon, from CRC Service, Inc., a California corporation; and *10 WHEREAS, WE is willing *589 to supply financing to Borrower; NOW, THEREFORE, in consideration of the mutual promises of the parties as set forth herein, it is hereby agreed as follows: 1. WE shall lend to Borrower the sum of Three Million Five Hundred Thousand Dollars ($3,500,000.00) for a period of approximately ten (10) years, at an effective annual interest rate of five percent (5%). 2. The parties recognize that the terms of the loan as outlined above are highly beneficial to Borrower in light of the cost of long-term financing in today's markets. Therefore, as additional consideration hereunder, Borrower must deposit with WE the sum of Five Million Dollars ($5,000,000.00) before the end of 1974. This deposit shall be for one year and shall be unsecured and interest-free; and WE shall use the entire sum in any way it sees fit during the deposit period. The entire Five Million Dollar ($5,000,000) deposit shall be repaid to Borrower one year from the date of receipt by WE. The responsibility for securing said Five Million Dollars ($5,000,000) and depositing it with WE is the sole obligation of Borrower hereunder. Further, WE shall have no obligation to provide financing to Borrower until such Borrower *590 has made the full deposit called for herein. 3. Immediately upon receipt of such interest-free deposit, WE will lend to Borrower the sum of Three Million Five Hundred Thousand Dollars ($3,500,000). Such sum shall be repaid by Borrower to WE, or its assignee, over a period not to exceed the ten (10) years together with interest at an effective rate of five percent (5%) per annum. The parties hereto expect to establish the precise repayment schedule for this obligation before the loan is made. It is contemplated that payments will be made on a monthly basis. It is understood between the parties that payments made during the first nine years shall be in the amount of Two Hundred Thousand Dollars ($200,000) per year. All sums repaid to WE during the first four (4) years shall be credited to interest only. The parties contemplate that the annual payments made during the subsequent five (5) years shall be credited entirely to principal.At the end of the ten (10) year period, Borrower shall pay to WE, or its assignee, the entire amount of principal and interest still due and owing at that time. 4. The source of payments to be made by Borrower to WE, or its assignee, will be the *591 rental of the apartment project to be constructed on the property purchased by Borrower and Borrower agrees to apply all such rental to the repayment of the obligation to be incurred hereunder and to no other purpose. *11 5. The parties agree that repayment of the obligation to be incurred by Borrower hereunder, need not commence until twelve (12) months from date or one month from the date on which Borrower shall start to collect rent from the then-constructed improvements whichever event shall first occur. * * * 7. The parties recognize that in order for Borrower to maximize the tax benefits available to its partners under currect United States tax law, there must be no personal liability on the part of any partner for the loan made by WE to Borrower thereunder. Therefore, WE agrees that there will be no personal liability on the part of any partner of the general partnership, and WE expressly acknowledges that such exclusion of personal liability is a prime condition of this Agreement. * * * 9. Borrower has been informed by WE that WE intends to assign its rights under this Agreement. 10.WE may assign its interest hereunder, by giving notice to Borrower. Borrower *592 may assign its interest hereunder to anyone provided that such assignee shall be approved by WE, or WE's assignee, and that such approval made in writing. Consent to assignment shall not be unreasonably withheld under the circumstances. WE was formed in the early Sixties. Mr. Harry Margolis was instrumental in establishing WE. It was established for two of Mr. Harry Margolis' clients in connection with a motion picture, "Blast of Science." Mr. Muehlenbeck signed, under the designation "General Partner" of the partnership, a promissory note dated December 19, 1974, in the amount of $5 million, stated on its face to be made by L.C. Properties Partnership payable to Antigua Banking Limited (ABL) with interest at 10 percent, with all interest to be prepaid. ABL was a corporation organized under the laws of Antigua. It was *12 engaged in business in California and was managed by Mr. Harry Margolis. The bank records of the partnership show cash transfers to and from its Barclays Bank of California account on December 20, 1974 (with "received from" and "disbursed to" as shown in the partnership's records), as follows: Cash
Cash
Received
Received From
Disbursed
Disbursed To
$1,000,000
ABL
$1,000,000
World Entertainers
1,000,000
ABL
1,000,000
World Entertainers
1,000,000
ABL
1,000,000
World Entertainers
1,000,000
ABL
1,000,000
World Entertainers
1,000,000
ABL
1,000,000
World Entertainers
1,000,000
World Entertainers
1,000,000
CRC Services, Inc.
1,000,000
World Entertainers
1,000,000
CRC Services, Inc.
1,000,000
World Entertainers
1,000,000
CRC Services, Inc.
500,000
World Entertainers
500,000
CRC Services, Inc.
500,000
Harry Margolis
500,000
ABL
Trustee
*593 The cash receipts and disbursements journals for the partnership show the above receipts and disbursements as transactions on December 19, 1974. The bank records of ABL show the following telephonic transfers to ABL's Barclays Bank of California account from unnamed accounts at Barclays Bank, Tortola, the British Virgin Islands, on December 20, 1974, as follows: *13 Amount Telephonically Transferred
$945,000
1,000,000
250,000
150,000
349,000
300,000
1,000,000
600,000
150,000
1,000,000
950,000
150,000
1,000,000
850,000
410,000
1,000,000
150,000
580,000
1,000,000
650,000
1,000,000
1,000,000
900,000
500,000
1,000,000
100,000
1,000,000
1,000,000
500,000
450,000
1,000,000
600,000
450,000
350,000
990,000
350,000
10,000
550,000
10,000
$24,244,000
Over half of the funds advanced to ABL were from WE. WE had an account at Barclays Bank, Tortola, which facilitated telephonic or telegraphic transfers from its account to ABL's account at Barclays Bank of California. When a telephonic transfer of funds is made to an account at Barclays Bank, those funds are immediately available for use by the account *594 to which transferred. CRC Services, Inc. (Convalescent Rehabilitation Center Services, Inc.; hereinafter CRC), was a California corporation formed in 1967 for the purpose of operating the Bel Haven Convalescent Hospital (hereinafter Bel Haven). Mr. Ben Margolis, a brother of Mr. Harry Margolis, and Mr. Ben Margolis' law partner had owned Bel Haven for several years prior to 1966, when they transferred their ownership interest to foreign trusts that Mr. Harry Margolis had established for them at Aruba Bonaire Curacao Trust Co. *14 (hereinafter ABC Trust Co. or ABC) in exchange for annuities. Sometime thereafter, World Minerals, a Netherlands Antilles corporation, was formed in Curacao by the office of a Mr. Smith at the instigation of Mr. Harry Margolis. World Minerals has been managed at various times by Mr. Smith's office and by ABC Trust Co. ABC Trust Co. was a trust company in Tortola, the British Virgin Islands, that managed a number of trusts established by Mr. Harry Margolis. The management of Bel Haven was the principal business activity of CRC until the fall of 1974 when Bel Haven was sold by CRC. Thereafter, CRC's activities consisted of acquiring and reselling *595 real property and acquiring financing for properties. CRC was liquidated in April 1976 and all its assets were distributed to its sole shareholder, World Minerals. The books and records of CRC were maintained by Mr. Harry Margolis' office from July 1974 until CRC's liquidation. Mr. Margolis established a bank account for CRC with Barclays Bank of California on July 22, 1974. Under date of December 19, 1974, a promissory note in favor of WE, in the stated amount of $3,500,000 with a stated interest rate of 5 percent per annum, requiring interest only payments of $200,000 per year for a period of 4 years and principal only thereafter for the next 5 years, with all interest and principal due and payable at the end of 10 years, was signed in the name of L.C. Properties Partnership by Mr. *15 Muehlenbeck, Partner. A document entitled "Agreement for the Sale of Real Property and the Improvements to be Constructed Thereon With Assignment of Lease," stated to be entered into on December 17, 1974, was signed in the name of the partnership by Mr. Muehlenbeck, Partner, and for CRC by Regina Leary, who was an employee in Mr. Margolis' law offices. The agreement recited that the partnership *596 purchased from CRC a 214-unit apartment complex to be built under a "specific Joint Venture Undertaking" between CRC and McMillan Mortgage Co. The document further stated that the purchase price of the property by the partnership from CRC for the completed project was $3,500,000, to be paid in cash by the partnership. The document further stated that CRC guaranteed completion of the 214-unit apartment complex by December 31, 1975. Thomas G. McMillan is and has been for 10 to 15 years a building contractor. Mr. McMillan also has approximately 15 years experience in the mortgage banking business. During the years here in issue and for some time prior thereto, he owned all the stock of McMillan Mortgage Co. of Reno, Nevada, a mortgage brokerage company, and McMillan Construction Co., a construction company. During the years here in issue and for some time prior thereto, he served as the chief executive officer of each of these corporations. Mr. McMillan was, from approximately 1958 until 1978, a client of Mr. Harry Margolis. Mr. Margolis furnished *16 accounting and legal services to Mr. McMillan and his corporations. Mr. Margolis, for some time prior to the years here *597 in issue, did tax planning for Mr. McMillan and other members of Mr. McMillan's family. Mr. Margolis had created a trust at ABC for Mr. McMillan's father, with Mr. McMillan as the beneficiary. Prior to March 21, 1972, Mr. McMillan negotiated the purchase of property from Messrs. Capurro, with one of the Capurros and Frank Peterson, an attorney. Mr. McMillan, as buyer of this property (the Capurro property) on behalf of McMillan Mortgage Co. had an escrow opened with First Commercial Title, Inc., with respect to the purchases. The escrow instructions which were signed by Messrs. Joe and Pete Capurro, as sellers, and Mr. McMillan for the McMillan Mortgage Co., as buyer, specified a consideration of approximately $88,000, the exact purchase price to be determined by a survey establishing the exact amount of acreage in the property. The price was to be computed at $8,000 per acre. Th closing date of the escrow was extended by agreement of the parties on September 15, 1972, to a date not before January 12, 1973, or later than January 20, 1973. The agreed extension was made because of a dispute between the parties which was unresolved at September 15, 1972, with respect to water *598 and ditch rights on a portion of the property. The escrow closed on January 24, 1973. The consideration paid by McMillan Mortgage Co. *17 for the Capurro property was $87,152. An amount totaling $87,152 was deposited in the escrow account by ABC on January 19, 1973. The $87,152 deposited by ABC into the escrow was paid out of a McMillan family trust at ABC of which Mr. McMillan was beneficiary. On January 23, 1973, McMillan Mortgage Co. entered into an agreement with First Commercial Title, Inc., whereby First Commercial Title, Inc., held the title to the Capurro property for McMillan Mortgage Co. Pursuant to the holding agreement, First Commercial Title, Inc., issued to McMillan Mortgage Co. an owner's policy of title insurance in the amount of $87,152.Mr. McMillan became aware of the Capurro property while he was building in the area in which that property was located. He entered into the agreement to purchase the Capurro property in the spring of 1972 with the intention of later acquiring the adjacent property known as the Larwin property. Mr. McMillan planned to develop the two properties together by building an apartment complex and a commercial development thereon. *599 On May 15, 1974, an agreement of purchase and sale of certain property was entered into between Larwin Multihousing Corp. and Mr. McMillan. The stated purchase price of this property (the Larwin property) in the agreement was $530,000. The purchase was conditioned upon Mr. McMillan's obtaining at least $102,000 in refundable credits from the City of Sparks, Nevada, or, in the *18 alternative, Larwin Multihousing Corp., at its option, reducting the price of the property by the difference between $102,000 and the amount of credit obtained by Mr. McMillan. Mr. McMillan had been negotiating for the purchase of the Larwin property with representatives of Larwin Multihousing Corp. for at least 6 months prior to the execution of the agreement on May 15, 1974.At Mr. McMillan's request, an escrow was opened with First Commercial Title, Inc., with respect to the purchase of the Larwin property. The escrow instructions dated August 26, 1974, were executed on behalf of Larwin Multihousing Corp., the seller, by H. Robert Gluck, its president, and by Mr. McMillan, as buyer. The escrow instructions specified total consideration for the Larwin property of $428,000, $100,000 to be paid *600 at the close of the escrow and a promissory note and first deed of trust to be executed by Mr. McMillan in favor of Larwin Multihousing Corp. in the principal amount of $328,000 for the balance of the purchase price. Under the terms of the note, the sum of $100,000 plus interest at 10 percent per annum was to be paid on or before July 1, 1975, with the balance plus 10 percent interest being paid on or before December 31, 1975. A promissory note for $328,000 and first deed of trust were executed by Mr. McMillan on behalf of McMillan Mortgage Co. in favor of Larwin Multihousing Corp.On December 31, 1974, in accordance with the terms specified in the escrow *19 instructions, the escrow with respect to the Larwin property closed. In consideration for the Larwin property, McMillan Mortgage Co., on December 30, 1974, paid $100,000 cash with a check drawn on its bank account at Nevada National Bank and issued a promissory note and deed of trust for $328,000 in accordance with the agreement.The deed from Larwin Multihousing Corp. conveying the Larwin property to McMillan Mortgage Co. was recorded on December 31, 1974. The first building permit with respect to the building of apartments *601 on the Capurro-Larwin property previously purchased in the name of McMillan Mortgage Co. was issued on March 5, 1975, for the building of Building No. 1 consisting of 6 units at an estimated cost of $60,525. This building permit was with respect to Phase I of the Sierra Woods apartment complex, which was to be the name of the apartments built on the Capurro-Larwin property and which ultimately was to consist of 214 apartment units. Thereafter various permits were issued. The grading and foundation permits were issued on March 5, 1975, when the permit for Building No. 1 was issued, with the estimated cost of the work to be $250,000. The permits for Building No. 2 consisting of 8 units, Building No. 3 consisting of 8 units, and Building No. 4 consisting of 6 units were issued on May 22, 1975. The permit for Building No. 5 consisting of 6 units was issued on May 27, 1975, and for Building No. *20 10 consisting of 8 units, on May 29, 1975. The permits for Building No. 11 and Building No. 6 consisting of 6 units each were issued on June 23, 1975, and for Building No. 7 and Building No. 14 consisting of 6 units and 8 units, respectively, on July 24, 1975. Also on July 24, 1975, a *602 permit was issued for the building of a recreation building. On August 11, 1975, a permit was issued for Building No. 8 consisting of 6 units; on September 17, 1975, a permit was issued for Building No. 9 consisting of 6 units; on October 3, 1975, a permit for Building No. 12 consisting of 6 units was issued; and on October 15, 1975, a permit was issued for Building No. 15 consisting of 6 units. On February 26, 1976, a permit was issued for Building No. 13 consisting of 6 units; on March 25, 1976, a permit was issued for Building No. 19 consisting of 8 units; on April 8, 1976, permits were issued for Building Nos. 16, 17, 18, 23 and 24 consisting of 6 units each, and for Building Nos. 21, 25 and 26 consisting of 8 units each. On April 20, 1976, permits were issued for Building Nos. 20, 22, 27, 28, 29 and 31 consisting of 8 units each, and Building No. 30 consisting of 6 units. These permits completed the total building in Phase I of the development, and the total estimated cost was $2,408,925. The first issuance of a certificate of occupancy was on July 30, 1975, with respect to Building No. 2. On July 31, 1975, certificates of occupancy were issued with respect to *21 *603 Building Nos. 3 and 4. On August 1, 1975, such a certificate was issued with respect to Building No. 1, and on August 14, 1975, with respect to Building Nos. 5 and 10. An occupancy certificate was issued on August 28, 1975, with respect to Building No. 11, and on September 12, 1975, with respect to Building No. 6. On August 18, 1975, an occupancy certificate was issued with respect to the recreation building. On October 8, 1975, occupancy certificates were issued with respect to Building Nos. 7 and 14, and on October 29, 1975, with respect to Building No. 8. An occupancy certificate was issued on November 13, 1975, with respect to Building No. 9, and on January 30, 1976, with respect to Building No. 12. At various dates in 1976, occupancy certificates were issued with respect to the other buildings in Phase I of the project, the last such certificate being issued on August 4, 1976. The first building permit with respect to Phase II of the Sierra Woods apartment complex which was to consist of 88 apartment units was issued on June 11, 1976, for Building No. 32 consisting of 8 units. On June 11, 1976, permits were also issued for Building Nos. 33, 36, 37, 39, 40, 41 and 43 consisting *604 of 8 units each, and Building Nos. 34, 38 and 42 consisting of 6 units each. On May 27, 1976, a permit was issued for Building No. 35 of 6 units. The total estimated cost of these buildings was $882,100. The first occupancy certificate with respect to Phase II was *22 issued on October 8, 1976, with respect to Building No. 32, and by December 21, 1976, occupancy certificates had been issued with respect to all units in Phase II. When the construction of Phase I of the Sierra Woods apartment complex began in March 1975, Mr. McMillan had not secured a construction loan. Mr. McMillan, in his construction projects, typically began construction before he secured a construction loan. When he began such construction, he would use his own funds, borrow from a bank on a short-term basis pending approval of the construction loan or borrow from Mr. Harry Margolis. When Mr. McMillan secured short-term bank loans for the beginning of such construction, they were generally unsecured. The banks would make these loans based on the reputation of McMillan Mortgage Co. for paying its debts. Mr. McMillan had over the years, on a number of occasions, borrowed money from Mr. Margolis and *605 various entities managed by Mr. Margolis. At one time before Mr. McMillan became successful in his business, Mr. Margolis lent him money for living expenses. Mr. Margolis also lent him money to start certain projects, which Mr. McMillan referred to as "front money" and lent him money to buy property, money for engineering work, money to secure building permits and other type costs prior to Mr. McMillan's receipt of a construction loan. When Mr. McMillan needed a loan from Mr. Margolis, he would call Mr. *23 Margolis on the telephone and, if Mr. Margolis were willing to make him the loan, Mr. Margolis would forward the money to Mr. McMillan. Mr. McMillan would not know the source of the funds that he was borrowing until later when Mr. Margolis would send Mr. McMillan the papers with respect to the loan to sign. Mr. McMillan considered the $87,152 paid by ABC for the purchase of the Capurro property to be "front money" from Mr. Margolis since Mr. McMillan never dealt directly with ABC but always dealt with ABC through Mr. Margolis. During the early part of 1975, Mr. McMillan applied for a construction loan for Phase I of the Sierra Woods apartment project at the Nevada National *606 Bank. Bank officials informed Mr. McMillan that the Nevada National Bank was unwilling to provide the construction loan unless he first obtained a standby loan, which is a tentative commitment to provide permanent financing to take out the construction loan. On April 16, 1975, Mr. McMillan sent copies of the specifications and cost breakdowns on Phase I of the Sierra Woods apartment project to a vice president and manager of Nationwide Loan Sales and Purchases of the Home Federal Savings and Loan Assn. of San Diego. The purpose of the material sent to Home Federal Savings and Loan Assn. of San Diego by Mr. McMillan was to interest that organization in making a standby loan for the Sierra Woods apartment project.In April 1975 and again in May *24 1975, Mr. McMillan sent financial statement of himself and his wife and of McMillan Mortgage Co. and McMillan Construction Co. to Union Bank and Nevada National Bank. On the statements of McMillan Mortgage Co., Mr. McMillan listed the Larwin-Capurro property as a real estate asset owned by McMillan Mortgage Co. Under date of May 21, 1975, Home Federal Savings and Loan Assn. of San Diego sent McMillan Mortgage Co. a standby commitment *607 letter with respect to Phase I of the Sierra Woods apartment project, and this commitment was approved on behalf of McMillan Mortgage Co. and the standby commitment accepted on behalf of that company by Mr. McMillan on June 6, 1975. The acceptance was made by Mr. McMillan by returning a properly executed copy of the May 21, 1975, standby commitment to Home Federal Savings and Loan Assn. of San Diego with a check for $56,000 drawn on McMillan Mortgage Co.'s account at Nevada National Bank. The $56,000 was to cover the nonrefundable commitment fee. During the period from June 1975 through October 1975, a vice president of Nevada National Bank and Mr. McMillan discussed with a vice president of Home Federal Savings and Loan Assn. of San Diego certain changes which they wished to be made to the May 21, 1975, standby commitment. On June 9, 1975, Mr. McMillan forwarded an appraisal of Phase I of the Sierra Woods apartment project which had been obtained by McMillan *25 Mortgage Co. to Home Federal Savings and Loan Assn. of San Diego as requested in the commitment letter of that institution dated May 21, 1975. On October 2, 1975, Mr. McMillan sent to the Nevada National Bank *608 a status report with respect to Phase I of the Sierra Woods apartment project. This statement showed that as of October 1, 1975, McMillan Mortgage Co. had expended $966,936.04 in direct costs on the project and that the estimated cost of constructing the buildings of the apartment complex by McMillan Mortgage Co. was $2,605,223.26. Of the $966,936.04 expended by McMillan Mortgage Co., $436,936.04 was from its own funds and $530,000 was amounts it had received in short-term loans from Nevada National Bank in the form of advances to be repaid from the initial draw on the construction loan.On October 23, 1975, Home Federal Savings and Loan Assn. of San Diego sent the first amendment to its May 21, 1975, standby commitment to Nevada National Bank. On January 8, 1976, Mr. McMillan sent a further status report with respect to Phase I of the Sierra Woods apartments complex to Nevada National Bank. During December 1975 and January and February 1976, a vice president of Nevada National Bank approached other lenders to seek their participation in the Sierra Woods apartment project construction loan. On February 13, 1976, Nevada National Bank was informed that Home Federal Savings and Loan *609 Assn. of Arizona would *26 participate in the $2,800,000 construction loan for the Sierra Woods apartment project. By February 23, 1976, the documentation reguired for the $2,800,000 construction loan for Phase I of the Sierra Woods apartments complex had been completed and Nevada National Bank had disbursed over $1 million on the first draw on this loan to Mr. McMillan or McMillan Mortgage Co. In connection with receipt of this loan, Mr. McMillan executed on behalf of McMillan Mortgage Co. and McMillan Construction Co. various documents, including a buy and sell agreement between the McMillan interests and the Nevada National Bank and Home Federal Savings and Loan of San Diego; a deed of trust and security agreement between the McMillan interests and Nevada National Bank, granting the Nevada National Bank a deed of trust on the Larwin-Capurro property with all improvements thereon and a security interest in chattels, furnishings, fixtures and equipment therein; a financing statement; and a resolution of the corporate board of McMillan Construction Co. to borrow $2,800,000. On February 23, 1976, a policy of title insurance was issued by American Title Insurance Co., insuring *610 that a fee simple interest in the Larwin-Capurro property was at that time vested in McMillan Mortgage Co. By July 15, 1976, Mr. McMillan, on behalf of McMillan Mortgage Co., had upon submission of a loan application negotiated a permanent loan for the Sierra Woods apartment project with Bank of *27 America, Sacramento, California. On July 15, 1976, a commitment letter, on behalf of Bank of America, with respect to this project was sent to Mr. McMillan setting forth the terms and conditions of the permanent financing loan. On July 23, 1976, Mr. McMillan, on behalf of McMillan Mortgage Co., agreed to and accepted the terms and conditions of the loan contained in the commitment letter. The loan was in the amount of $3,750,000, of which $2,675,000 was to be disbursed upon completion of Phase I of the Sierra Woods apartment project to repay the Nevada National Bank construction loan and the balance was to be used for construction on Phase II of the Sierra Woods apartment project, with disbursement of $160,000 of that amount subject to a rental achievement clause. The deed of trust executed as security for payment of the $3,750,000 loan to the Bank of America, Sacramento, California, *611 was by Roselisa Corp. by Mr. McMillan as president. On March 17, 1978, Bank of America sent a commitment letter with respect to a $4,450,000 loan to Mr. McMillan, and on March 30, 1978, Mr. McMillan, on behalf of Roselisa Corp., agreed to and accepted the terms and conditions of the loan contained in the commitment letter. Of the $4,450,000, the amount of $3,724,159.38 was to be used to pay off the balance of the $3,750,000 loan made to McMillan Mortgage Co. by Bank of America, Sacramento, California. A deed of trust on the Sierrs Woods apartments *28 as security for the payment of the $4,450,000 loan was executed by Mr. McMillan, on behalf of Roselisa Corp., in favor of Bank of America National Trust and Savings Assn. on April 7, 1978. Roselisa Corp. was a corporation formed on behalf of Mr. McMillan in which Mr. McMillan owned all the stock. On August 11, 1976, the Sierra Woods apartments and a part of the Larwin-Capurro property was conveyed by McMillan Mortgage Co. to Roselisa Corp. On or about May 1, 1978, Mr. McMillan, as president of Roselisa Corp., entered into an installment sales contract with Robert L. Dunnett, as president of Associated Advisors. This contract *612 provided that Roselisa Corp. Would convey its title to Phases I and II of the Sierra Woods apartment complex and the real property on which it was located to Associated Advisors for a total price of $7,600,000, with Roselisa Corp. to have the responsibility of making payments on the $4,450,000 Bank of America loan. On June 19, 1978, Roselisa Corp. conveyed the Sierra Woods apartment house complex and the real property on which it was located to Associated Advisors, and on that same date McMillan Mortgage Co. conveyed to Associated Advisors that portion of the Capurro property which previously had not been conveyed to Roselisa Corp., thereby having the entire Larwin-Capurro property conveyed to Associated Advisors. *29 Mr. McMillan's signature appears on the following documents, either for himself or on behalf of McMillan Mortgage Co. or McMillan Construction Co. as indicated, although Mr. McMillan does not remember signing these documents or any of the provisions contained in the documents: (1) A joint venture agreement between ABC and McMillan Mortgage Co. bearing a date of January 29, 1973, which provides that ABC agrees to provide the cash necessary to acquire the Capurro *613 property and McMillan Mortgage Co. agrees to provide services relating to the ultimate sale of the properties, with the net profits from the sale to be shared between the parties. (2) A document entitled "Agreement for the Sale of Real Property," bearing a date of November 28, 1974, and stating that it is entered into between the ABC joint venture and CRC. The document provided that CRC was to purchase the Capurro property from the ABC joint venture for a price of $450,000. (3) A document dated December 3, 1974, entitled "Joint Venture Agreement," stating that it was a joint venture agreement between McMillan Mortgage Co. and CRC for the acquisition and development of the Larwin and Capurro properties. This document recited that CRC had made arrangements to acquire approximately 13.02 acres from Larwin Construction Co. and 10.70 acres from ABC Trust Co. *30 and that the parties desired to arrange for the construction and sale of various improvements to be developed on these properties. It further recited that title to the properties would be placed in either McMillan Mortgage Co. or a Reno, Nevada, title company for the convenience of the joint venture, but that the title *614 to such property would be held for the benefit of CRC. The agreement further recited that the parties recognized that McMillan Mortgage Co. would be important to the development of the property in terms of interim and permanent financing and the ultimate possible necessity of operating the improvements or participating in any syndication, and that McMillan Mortgage Co. would be entitled to receive a sum equal to one-half of 1 percent of the gross sales price of all properties developed and sold under the agreement if it had been a party to the development. It further recited that the parties contemplated that McMillan Construction Co. would be used for all development of the property and would receive fees for its services, to be negotiated with reference to each project. (4) A letter dated December 12, 1974, addressed to Ms. Regina Leary, president, CRC, at Saratoga, California, and signed on behalf of McMillan Mortgage Co. by T. G. McMillan, president, reciting that pursuant to the joint venture agreement of December 3, McMillan Mortgage Co. is pleased to acknowledge that it will hold title to the *31 property being acquired by CRC from Larwin Construction Co. and the *615 property being acquired by ABC for the sole benefit of CRC as the sole owner. (5) A document dated December 15, 1974, entitled "Specific Joint Venture Undertaking" signed by T. G. McMillan, president, McMillan Mortgage Co., and Regina Leary, president, CRC. This document recited that CRC agreed to contribute 9.41 acres of property from the Larwin-Capurro property for the construction of a 214 unit apartment house and that McMillan Mortgage Co. would supply McMillan Construction Co. for constructing the apartment house projects under plans and specifications to be developed by the parties. Paragraph 5 of this document stated as follows: CRC will make available to McMillan the sum of Three Million Dollars ($3,000,000.00) to permit McMillan to go forward with the construction of the project provided that CRC has been successful in syndicating the project. CRC expects to have the free use of such Three Million Dollars ($3,000,000.00) for a period not to exceed 120 days. The sum shall thus be made available by CRC to McMillan without charge for not to exceed 120 days. McMillan is to obtain construction and/or permanent financing within such 120-day period so as to be in a position *616 to return not less than Two Million Five Hundred Thousand Dollars ($2,500,000.00) of the Three Million Dollars ($3,000,000.00) at the conclusion of the 120th day with the balance to be returned on the conclusion of the project but no later than December 31st, 1975. Should McMillan not return any portion of the Three Million Dollar ($3,000,000.00) loan within the period required hereunder, McMillan shall pay to CRC ten percent (10%) interest for the use of such funds for the first 60 days, and twelve percent (12%) thereafter. *32 The document further stated that the net profit of the joint venture shall be divided 25 percent to McMillan Mortgage and 75 percent to CRC. (6) A document under date of December 15, 1974, signed by Thomas G. McMillan as president of McMillan Mortgage Co. and Regina Leary as president of CRC entitled "Lease Agreement." This agreement recited that CRC, as landlord, agreed to lease to McMillan Mortgage Co., as tenant, the Larwin-Capurro property which was the subject of the joint venture agreement and all the improvements to be erected thereon consisting of a 214-unit apartment project, with all personal property, equipment, fixtures and furnishings *617 to be installed and located in the project. The agreement provided that the tenant should construct at its own risk the buildings and that the term of the lease agreement should commence on the date of first occupancy of the first apartment and should continue for 60 months from the date on which the obligation to pay the first rent occurs. It provided that in the event the improvements had not been completed by tenant on or before December 31, 1975, the landlord should have the option to extend the terms of the lease agreement for a period not to exceed 1 year. The agreement provided that the tenant should pay the landlord $5,000 per month commencing on the date of first occupancy and that the rent should increase to $10,000 per month on the date of 40 percent occupancy and further increase to *33 $20,000 per month on the date of 60 percent occupancy and then should increase to $25,000 per month on the date of 80 percent occupancy and should not thereafter be decreased during the time of the lease. Mr. McMillan had no recollection of any of the documents which he signed purporting to constitute agreements between himself, McMillan Mortgage Co. or McMillan Construction *618 Co. and ABC and CRC. He received these documents from Mr. Margolis with the request that he sign them and did not recall reading them before he signed them. Mr. McMillan, at the time of the trial, could not remember Mrs. Leary, if he had ever known her, and never had entered into negotiations with her on behalf of McMillan Mortgage Co., McMillan Construction Co. or personally. Under date of December 17, 1974, a document entitled "Agreement for the Sale of Real Property and the Improvements to be Constructed Thereon With Assignment of Lease" was signed by Robert Muehlenbeck, Partner, under the name "L.C. Properties Partnership, Buyer," and by Regina Leary, president, under the name of "CRC Services, Inc., Seller." This document stated that CRC, the seller, was the owner of certain real property known as the Larwin-Capurro property, and that the seller and McMillan Mortgage Co. had entered into a specific joint venture undertaking of December 15, 1974, for the purpose of improving and *34 dispsing of 9.41 acres of this property. The agreement further stated that the seller desired to sell all of its interest in the 9.41 acres and the to-be completed improvements thereon, *619 and to assign over to the buyer the seller's interest in an attached lease agreement, and that the buyer wished to acquire the land with improvements and the lease agreement. The agreement further recited that the seller had a relationship with WE which enabled seller to guarantee the availability of financing to the buyer for the purpose of purchasing the property and improvements thereon. The agreement then provided for the sale and purchase of the property with the total purchase price to be $3,500,000, $400,000 to be allocated to the land and $3,100,000 to the improvements. Following the signatures on this document of Mr. Muehlenbeck and Ms. Leary, the following appears: ACKNOWLEDGEMENT McMillan Mortgage Company, a Nevada corporation, acknowledges that the transaction set forth hereinabove has been accomplished in accordance with the terms and conditions of the Specific Joint Venture Undertaking of December 15, 1974, between CRC Services, Inc., and McMillan Mortgage Company. McMillan Mortgage Company therefore approves the "Agreement For The Sale Of Real Property And The Improvements To Be Constructed Thereon With Assignment Of Lease" in its entirety. McMILLAN MORTGAGE *620 COMPANY By /s/ Thomas G. McMillan Thomas G. McMillan, President *35 Mr. McMillan recognized his signature on this document but had no recollection of signing it or reading it or of the provisions contained in the document. Under date of August 1, 1976, Mr. McMillan signed as president of Roselisa Corp., buyer, with each of the partners of L.C. Properties Partnership, designated as a seller, documents entitled "Agreement to Sell Partnership Interest." Each of these documents, with the exception of the name of the seller, the amount of the seller's interest in L.C. Properties Partnership, and the amount of the seller's stated initial capital contribution to the partnership was the same. Each document stated that the records of L.C. Properties Partnership had been submitted to the buyer and that the buyer agrees to pay the seller a specified amount in full and complete consideration of the interest sold by the seller to the buyer, payment to be made in full prior to November 15, 1976. The total net cash sum stated in these agreements to be paid by Roselisa Corp. to the various partners of L.C. Properties Partnership was $600,000, and the agreements stated that Roselisa *621 Corp. assumed the liabilities of L.C. Properties Partnership. Under date of December 10, 1974, a letter was addressed on stationery of CRC to Noel Barton, EST International Ltd. in Tortola, British Virgin Islands, signed on behalf of CRC by Regina Leary, president. This *36 letter stated that it appeared highly probable that CRC would acquire the Larwin-Capurro properties and would carve out 9 acres at a land cost of approximately $450,000 and a construction cost of $2,700,000 for a theoretical profit of $450,000. The letter referred to the necessity of CRC entering into a joint venture agreement with McMillan Mortgage Co. and T. G. McMillan, with 25 percent of the ultimate profit to go to McMillan Mortgage Co. and costs of $35,000 to be charged by Mr. McMillan for special services. Following these statements the following paragraph appears: Discussions have been held with Talmud Properties Partnership, Koran Properties Partnership, Zen Properties Partnership and Isis Properties Partnership, and they are willing to permit a portion of the available financing contracted for by them from World Entertainers Limited to be utilized for this project for a flat fee of $100,000, *622 to be divided equally and paid over four years, commencing with 1975.It is our understanding that WE would not be willing to provide the financing under its regular arrangements with Talmud, Koran, Zen and Isis. CRC believes the project to be sufficiently profitable to justify CRC paying the $100,000. A variety of documents have been drafted with reference to this entire matter, and CRC would wish to carry out its obligations to you provided the foregoing was generally acceptable to you. Please examine the documents and advise us of your position in the matter. The books and records of all the entities concerned with the various transactions involved herein, other than those of WE, were kept in the offices of Harry Margolis. Book entries of these various entities comported with transactions outlined in the various agreements. Each of the agreements with respect to the Larwin-Capurro *37 properties and the buildings to be built thereon was signed by an officer of the respective entity. All the various entities whose books were kept in the law offices of Harry Margolis had bank accounts at Barclays Bank of California. In a number of instances the dates entered with respect *623 to a transaction on the books of the various entities did not coincide with dates shown of transfers of money on the records of Barclays Bank of California with respect to the various entities. The records of CRC show the following transactions in its account at Barclays Bank of California under date of December 20, 1974: *38 Cash
Cash
Received
Received From
Disbursed
Disbursed To
$1,000,000
L.C. Properties
$1,000,000
McMillan Mortgage
Partnership
1,000,000
L.C. Properties
1,000,000
McMillan Mortgage
Partnership
1,000,000
L.C. Properties
1,000,000
McMillan Mortgage
Partnership
500,000
L.C. Properties
500,000
ABL
Partnership
900,000
Fresno Properties
800,000
Assoc. Conv. Enter.
Partnership
80,000
EST International
20,000
ABL
1,000,000
Nevada Enterprises
1,000,000
ABC Trust Co., Ltd.
Partnership
1,000,000
Nevada Enterprises
494,000
ABC Trust Co., Ltd.
Partnership
486,000
EST International
20,000
EST International
20,000
ABL
$6,420,000
$6,400,000
Three separate checks drawn by CRC on its account at Barclays Bank of California in favor of McMillan Mortgage Co. were listed in the cash *624 receipts and disbursement journal for McMillan Mortgage Co. as deposited in its account at Barclays Bank of California as follows: Cash
Received
Date
Received
From
Received
$1,000,000
CRC
12/19/74
1,000,000
CRC
12/19/74
1,000,000
CRC
12/19/74
*39 The three checks were each dated December 19, 1974. This same ledger shows cash disbursements to ABL from the receipts from CRC as follows: Cash
Disbursed
Date
Disbursed
To
Disbursed
$1,000,000
ABL
12/17/74
1,000,000
ABL
12/17/74
1,000,000
ABL
12/17/74
Although the date reflected on the books of McMillan Mortgage Co. indicate transfers of three $1 million from CRC on December 19, 1974, and transfers out by McMillan Mortgage Co. to ABL on December 17, 1974, the posting is erroneous and the dates in each instance should have been December 20, 1974. The bank records of L.C. Properties Partnership for its Barclays Bank of California account show the following cash transfers to and from the account on December 9, 1975: *40 Cash
Cash
Received
Received From
Disbursed
Disbursed To
$500,000
World Entertainers,
$500,000
Barclays Bank,
Barclays Bank, Tortola
Tortola
1,500,000
World Entertainers,
1,500,000
Barclays Bank,
Barclays Bank, Tortola
Tortola
1,500,000
World Entertainers,
1,500,000
Barclays Bank,
Barclays Bank, Tortola
Tortola
1,500,000
World Entertainers,
1,500,000
Barclays Bank,
Barclays Bank, Tortola
Tortola
100,000
McMillan Mortgage
200,000
Barclays Bank,
100,000
CRC Services, Inc.
Tortola for
Hexagram N.V. [7]
*625 The cash receipts and cash disbursement journal for the Roselisa Corp. bank account at Barclays Bank of California for the month of November 1976 show the following cash transfers to and from the account on November 12, 1976: *41 Cash
Cash
Received
Received From
Disbursed
Disbursed To
$1,000,000
ADC *
$ 661,092.00
ABL
175,000
ADC
138,312.40
Jack Froom MD
A Medical Corp.
31,754
L.C. Properties
90,273.27
MISAT
Partnership
3,486.61
Andersen Trust
10,192.49
Gladstein Trust
9,036.33
Leonard Trust
2,330.43
Norman Leonard
2,330.43
Patsey Trust
36,410.97
Ed Thorp
29,132.39
Michael Gurdin
72,804.55
Meyer Zeiler
8,448.40
Erhard Trust
71,320.54
Thomas Scortia
71,320.54
Frank Robinson
$1,206,754
$1,206,491.35
*626 A journal entry in the books of Roselisa Corp. dated August 31, 1976, showed under an account No. 600 "Notes Payable Unsecured," an assumption by Roselisa Corp. of $3,500,000, representing the WE-Hexagram note. The following appears as charges and credits in the books and records of Roselisa Corp. as of March 9, 1977: *42 Charge
Account Charged
Credit
Account Charged
2,136,562
#600
$1,874,955
#600
Notes Payable --
Notes Payable --
Unsecured
Unsecured
(Hexagram)
(T. G. McMillan)
11,604
#505
Interest Payable
250,000
#710
Paid In Surplus
The offices of Mr. Harry Margolis maintained the books and records of of many entities concerning their accounts at Barclays Bank of California, including all the entities involved in the transactions and documents set forth herein. An employee of Mr. Harry Margolis had the responsibility of arranging money movements through the accounts of the entities and persons whose accounts at Barclays Bank of California were managed by Mr. Margolis. When a money movement was to take place, this employee would notify the proper person at Barclays Bank of California, and a day *627 prior to the money movement take the papers directing the movement to the bank and arrange them in the order in which the movement was to occur. The bank was then prepared for telephonic or telegraphic transfers of funds in accordance with Mr. Margolis' plan. On its 1974 partnership return of income, L.C. Properties Partnership reported an ordinary loss of $500,125, computed as follows: *43 Total income
Less expenses: Interest
(prepaid interest on
Antigua Bank Ltd loan)
500,000
Bank charges
125
Total loss
$500,125
Petitioners, on their Federal income tax returns for 1974 or returns for the fiscal year in which December 31, 1974, fell, claimed a pro rata portion of the $500,125 loss reported by L.C. Properties Partnership on its 1974 return of income. On its 1975 partnership return of income, L.C. Properties Partnership reported an ordinary loss of $14,986, computed as follows: Gross rents
$100,000
Less expenses: Interest
$209,728
Legal & Accounting
864
Miscellaneous
135
Office
189
210,916
Loss
$122,233
Interest Income
7,247
Other income (Settlement for
release from contract)
100,000
Loss
$ 14,986
*628 *44 The interest deduction claimed as an expense on this return of $209,728 included $200,000 of interest stated to have been paid in connection with the WE Hexagram note. Petitioners, on their Federal income tax returns for 1975 or returns for the fiscal year in which December 31, 1975, fell claimed a pro rata portion of the $14,986 loss reported by L.C. Properties Partnership on its 1975 return of income. On its final partnership return of income for its taxable year ending July 31, 1976, L.C. Properties Partnership reported ordinary income in the total amount of $25,716, and petitioners whose years 1976 are involved in this case each reported a pro rata portion of the $25,716 as income and also reported a capital gain from the sale of an interest in L.C. Properties Partnership. Among the adjustments made by respondent to the income tax reported by each of petitioners was a disallowance of the losses claimed by each petitioner from L.C. Properties Partnership for the calendar years 1974 and 1975 or the fiscal year of a petitioner in which December 31, 1974, and December 31, 1975, fell. There are other adjustments in most of the cases which are not involved in the *629 severed issue presented herein. *45 OPINION The loss reported by L.C. Properties Partnership on its return of income for the calendar year 1974, except for $125, resulted from interest claimed to have been paid by L.C. Properties Partnership of $500,000 on a $5 million loan from ABL. The largest item of expense claimed by L.C. Properties Partnership in computing its claimed loss for the calendar year 1975 was $200,000 of interest claimed to have been paid on a $3,500,000 loan from WE, which indebtedness was claimed by petitioners to have been assigned by WE to Hexagram Corp., to which corporation the $200,000 of interest was claimed to have been paid. The major issue in this case centers around the two interest payments above discussed. The $125 bank charges in 1974 were the result of transfers involved with the claimed $5 million loan from ABL, which $5 million was claimed to have been placed interest-free with WE in December 1974. Therefore, the bank charges of $125 are directly related to the claimed interest deduction. Although respondent argues extensively that the entire transaction concerning the involvement of L.C. Properties Partnership in the Larwin-Capurro *630 property was a sham, the major issue concerns claimed interest deductions by L.C. Properties Partnership in 1974 and 1975. *46 Petitioners take the position that they have produced documents and book entries that establish the losses claimed by the partnership. They take the position that the evidence shows that the book entries were of contemporaneous events and are entitled to be accepted in this case.They also argue that the documents relating to the various transactions involved contain elements of a bargain between the parties and that these documents should govern the legal characterization of the transactions. It is petitioners' position that the various documents and records introduced into evidence in this case establish that the deduction for interest claimed was in fact interest paid in the taxable year involved and that the payment was on an indebtedness which would be legally enforceable under the appropriate laws. They further take the position that the underlying indebtedness on which the inerest deductions were claimed was the obligation of L.C. Properties Partnership. Petitioners argue that the interest deduction allowed by section 163 is extremely broad. *631 They contend that they are not required to show that the interest payment served a business purpose, that it was an ordinary and necessary expense or even reasonable in order to be entitled to the claimed deduction under section 163. They contend that all they need to show is that the amount was paid by L.C. Properties Partnership on an indebtedness which is the *47 legal obligation of that partnership, citing Goldstein v. Commissioner,364 F.2d 734, 741 (2d Cir. 1966); Stanton v. Commissioner,34 T.C. 1, 7 (1960). Petitioners recognize that if the interest expense is induction, it is not deductible. Knetsch v. United States,364 U.S. 361 (1960). Respondent takes the position that petitioners have failed to establish that either the $5 million claimed indebtedness on which the interest deduction for 1974 was based or the $3,500,000 claimed indebtedness on which the interest deduction for 1975 was based was in fact a true indebtedness of L.C. Properties Partnership. Respondent argues that for this reason alone the claimed interest deductions should be disallowed. Respondent further argues that the transactions purportedly *632 entered into, between L.C. Properties Partnership and other entities with respect to the Larwin-Capurro property were shams. In fact, respondent argues that the only reason for the formation or existence of L.C. Properties Partnership was the obtaining of tax deductions and therefore the organization and all its activities were shams. If the purported loan from ABL to L.C. Properties Partnership of $5 million, for which petitioners claim an enforceable $5 million note was signed on behalf of L.C. Properties Partnership, was in fact never made, the deduction claimed for interest is not allowable. It is *48 well settled that the mere fact that a note is given does not prove the existence of a loan if there was no indebtedness existing which the note evidenced. Elbert v. Commissioner,45 B.T.A. 685 (1941); see also, Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Looking at the evidence in the instant case, there is a clear indication that in fact no money was lent in a substantive sense to L.C. Properties Partnership by ABL. The record shows that on December 20, 1974, $1 million was transfered *633 to the account of L.C. Properties Partnership at Barclays Bank of California by ABL and immediately the $1 million was disbursed to WE. This transaction was repeated an additional four times. On this same date, ABL received 12 separate telephonic transfers of money from Barclays Bank, Tortola. Although there is no specific showing in the record of the source of the 12 different transfers of $1 million, the inference is unmistakable that most if not all of these transfers were from the account of WE at Barclays Bank in Tortola.The evidence shows that most of the funds received by ABL from Barclays Bank, Tortola, came from WE. The record does not contain any evidence relating to accounts at Barclays Bank, Tortola, or relating to WE's accounts. However, the inference is clear that WE transferred funds to ABL, which transferred the same funds to L.C. Properties Partnership, which retransferred the same funds back to WE. Certainly *49 it is incumbent on petitioners to produce evidence to the contrary if any such evidence exists. Particularly is this the situation since it was petitioners who chose to deal with a foreign entity whose records are not subject to the subpoena *634 powers of this Court. Therefore, we conclude on the basis of the record as a whole that the $1 million transferred by ABL on December 20 to the account of L.C. Properties Partnership at Barclays Bank of California came to ABL from WE, and this $1 million was disbursed by L.C. Properties Partnership to WE. The $1 million was then retransferred from WE to ABL and from ABL to L.C. Properties Partnership, and by L.C. Properties Partnership back to WE. This circular transfer was repeated four additional times. As a result, all that happened was that $1 million made the rounds five times, from WE to ABL to L.C. Properties Partnership back to WE, and there was no indebtedness of $5 million or any other amount from L.C. Properties Partnership to ABL because of this circular transaction. In fact, there was no $5 million deposited by L.C. Properties Partnership with WE which remained with WE. The reason claimed by petitioners for the borrowing of $5 million by L.C. Properties Partnership from ABL was to place the amount borrowed with WE for 1 year interest-free. This claimed transaction never occurred in substance. *50 In Karme v. Commissioner,73 T.C. 1163, 1186-1187 (1980), *635 affd. 673 F.2d 1062 (9th Cir. 1982), we stated in regard to a similar circular movement of money: When the transfer of $600,000 from Alms to petitioner is viewed as a part of the entire money movement transaction, [17] it becomes apparent that Alms was not a true lender but was a mere conduit in the circulation of the Union Bank loan proceeds back to petitioner and Union Bank. Putting aside for the moment a discussion of the genuineness of petitioner's payment to World Minerals, we believe that no purpose, from anyone's standpoint, has been shown for the transfer of the $600,000 from World Minerals back to Alms. There is no reason to presume that the World Minerals-Alms transaction was conducted at arm's length since both entities were effectively controlled by Margolis. Cf. Shapiro v. Commissioner,40 T.C. 34, 39 (1963). [18] Although the payment from Alms to petitioner was designed to appear to be a loan, its main effect was simply to complete the circuit so that petitioner could repay the Union Bank loan. The November 1970 money movement, [Fn. 19 ref. omitted] which included the "refund" of the stock purchase payment and the "repayment" of the *636 Alms "loan," was merely the same circuit in reverse * * *. *637 *51 In the instant case, the record indicates that there was no true loan of $5 million by ABL to L.C. Properties Partnership, and no true deposit of $5 million by L.C. Properties Partnership with WE. Here, as in the Karme case, on December 9, 1975, the circular movement of money was reversed except, instead of increments of $1 million five times, there were three $1,500,000 transfers and one $500,000. This circle took the form of a transfer to the account of L.C. Properties Partnership at Barclays Bank of California of $500,000 by WE, which amount was disbursed by L.C. Properties Partnership to Barclays Bank, Tortola. This was followed by three separate transfers of $1,500,000 by WE, Barclays Bank, Tortola, and transfer of the $1,500,000 by L.C. Properties Partnership back to Barclays Bank, Tortola. These transfers totaling $5 million were made to appear to be a return by WE of the $5 million which it is claimed L.C. Properties Partnership had deposited with WE, and a payment by WE of the $5 million note which petitioners alleged had been assigned by ABL to Barclays Bank, Tortola. There is substantial testimony in the record with respect to the various money movements *638 made under the direction of Harry Margolis.Without repeating in detail the findings we have made, it is clear that Mr. Margolis' office would arrange for various transfers of money telephonically since it was possible in this manner, in a *52 short period of time, to have a large amount in total transferred to and from an account in smaller increments. In other words, Barclays, Tortola, would telephone $1 million to Barclays Bank of California and within a few minutes the same amount would be used to telephone the same $1 million back to Barclays, Tortola, and the same amount again would be used to be telephoned back to Barclays Bank of California. An employee of Mr. Margolis' office would outline the various transfers to be made ahead of time for Barclays Bank of California so that the bank could follow through in the manner planned in Mr. Margolis' office. On the basis of this record, we conclude that L.C. Properties Partnership did not have a true indebtedness of $5 million to ABL and therefore the purported payment of interest of $500,000 was not, in fact, an interest payment and is not deductible by L.C. Properties Partnership. The same situation of circular movement *639 appears with respect to the $3,500,000 amount with respect to which petitioners claim a $200,000 interest payment was made in 1975. This circular movement is a little more complicated than the one in 1974, but nevertheless, upon analysis, is as transparent. The bank records of L.C. Properties Partnership show a receipt of $1 million from WE, which $1 million was disbursed by L.C. Properties Partnership to the bank account of CRC, which $1 million was disbursed by CRC to the account of McMillan Mortgage Co. at Barclays *53 Bank of California, and by McMillan Mortgage Co. from that account to ABL. Missing in the link is the precise showing of ABL's disbursement to WE of the same $1 million. However, because of the numerous back-and-forth disbursements between WE and ABL, we conclude on the basis of this record that in fact the circle was complete. Again we stress that petitioners chose to deal with a foreign entity and were thus able to conceal absolute proof of the final step in the circle. The $500,000 disbursement to the account of L.C. Properties Partnership by WE, which amount was then disbursed by L.C. Properties Partnership to CRC, is a little more difficult to trace, *640 but we conclude from the record as a whole that this $500,000 also found its way back to WE. The $500,000 appears to have been disbursed directly by L.C. Properties Partnership to ABL, and again the inference is that it was disbursed by ABL to WE. . WE therefore conclude that as a matter of substance as distinguished from form there was no $3,500,000 loan by WE to L.C. Properties Partnership. The reverse of this transaction took place in connection with the supposed disposition of the Larwin-Capurro property from L.C. Properties Partnership to Roselisa Corp. and the sale of the property by Roselisa Corp. Even though more difficult to follow, we conclude from the record as a whole that various book entries were made to give the appearance of a repayment of the *54 $3,500,000 loan, but these entries did not in fact evidence substantive transactions. We therefore conclude that the purported $200,000 payment of interest by L.C. Properties Partnership to Hexagram in 1975 was not a payment on a true indebtedness. From this record as a whole, we conclude that Mr. McMillan and his corporations, McMillan Mortgage Co. and McMillan Construction Co, found property to acquire on *641 which to build an apartment complex to use as rental property or sell at a profit. Mr. McMillan, through the Nevada National Bank and the Bank of America, acquired the financing to build the apartment complexes. At time of purchasing the first land on which to build the apartments, Mr. McMillan needed financial assistance and approached Mr. Harry Margolis to attempt to obtain some funds from a family trust set up by his father of which he was a beneficiary. Mr. Margolis obtained the funds from the trust for Mr. McMillan to use to purchase the property.Aside from this one advance of funds to Mr. McMillan by a trust of which he was the beneficiary, the purchase of the land and the construction of the apartments was done with funds which Mr. McMillan personally advanced either from his own or his company's funds or from funds borrowed on his personal note or his company's note or on construction loans or take-out loans which he arranged. Totally unconnected with these substantive transactions, Mr. *55 McMillan signed various agreements and documents concerning this property at the request of Mr. Harry Margolis. Petitioners claimed that the purpose of the numerous complicated *642 transactions was to assist in financing the construction of the Sierra Woods apartment complex. However, the record shows that other than the money that came from the foreign trust of which Mr. McMillan was a beneficiary, in connection with the purchase of the Capurro property, none of the funds for purchasing this property or developing it came through the claimed financing arrangements made in connection with the various alleged transfers of the property to and from entities controlled by Mr. Harry Margolis. The $100,000 downpayment on the Larwin property was by a check from the bank account of McMillan Mortgage Co. at the Union National Bank. The note for the balance of the amount to be paid for this property was signed on behalf of McMillan Mortgage Co. by Mr. McMillan. The other actual financing of the project was arranged by Mr. McMillan with the Nevada National Bank and the Bank of America. There are many other indications in this record of lack of substance to many of the transactions that are purportedly evidenced by the various documents signed by Mr. McMillan and on behalf of entities managed or controlled by Mr. Harry Margolis. Mr. McMillan, in his testimony, identified *643 his signature on these documents and *56 admitted that he signed many documents sent to him by Mr. Margolis, very often not even reading them. It is clear from Mr. McMillan's testimony that he considered the Sierra Woods apartment complex and the land on which it was placed to be an asset of McMillan Mortgage Co. at all times, although there were liens on the property as security for borrowed funds. We conclude that the various transactions of L.C. Properties Partnership in connection with the purported acquisition of the Sierra Woods apartment complex were not substantive transactions and that in fact L.C. Properties Partnership was never the equitable owner of that project. As we stated in Golsen v. Commissioner,54 T.C. at 755, "there does not appear to be any * * * reason for the * * * wholly meaningless superstructure of 'loans'." Having concluded that the claimed interest deductions by L.C. Properties Partnership are not properly allowable, it follows that petitioners are not entitled to the claimed deductions of losses by L.C. Properties Partnership in 1974 and 1975. [8]
*644 *57 The issue before us in this case concerns only the claimed losses by L.C. Properties Partnership in the calendar years 1974 and 1975. We sustain respondent's disallowance of those claimed losses and hold that petitioners have failed to show that L.C. Properties Partnership sustained any losses in either of these years. Since the $125 was related to the telephonic transfer of the five $1 million in 1974, we conclude that there was no substance to that claimed deduction. It was so intimately related to a transaction which lacked substance as to be a part of that transaction. The only issue we have is the *58 severed issue of whether L.C. Properties Partnership sustained losses in 1974 and 1975, and our conclusion is that it did not. When the remaining issues in the various cases have been disposed of by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Leonard Trust: R. Dunnett, Et al., Trustees, docket No. 5895-78; Andersen Trust: Dunnett, Et Al., Trustees, docket No. 5907-78; Patsey Trust: R. Dunnett, Et Al., Trustees, docket No. 5925-78; Benjamin O. Andersen and Kay M. Andersen, docket Nos. 5937-78, 9255-79 and 11672-80; Gladstein Trust: R. Dunnett, Et Al., Trustees, docket No. 6161-78; Frank M. Robinson, docket Nos. 7040-78, 8189-79 and 10889-80; Robert S. Muehlenbeck and Carolyn T. Muehlenbeck, docket Nos. 7042-78 and 8192-79; Thomas N. Scortia, docket Nos. 7043-78, 8190-79 and 10888-80; Edward O. Thorp and Vivian S. Thorp, docket Nos. 10995-78, 8195-79 and 11657-80; Richard Gladstein and Caroline Gladstein, docket Nos. 11750-78 and 11655-80; Leonard Trust: Robert Dunnett, Et Al., Trustees, docket No. 9008-79; Andersen Trust, Robert Dunnett, Et Al., Trustees, docket No. 9256-79; Patsey Trust, Robert Dunnett, Et Al., Trustees, docket No. 9257-79; Gladstein Trust: Robert Dunnett, Et Al., Trustees, docket No. 9264-79; MISAT Development Corp., docket Nos. 13128-79 and 16196-80; Jack Froom, M.D., Medical Corp., A California Corp., docket No. 13129-79; Michael Gurdin and Marlene Gurdin, docket No. 14472-80; and Meyer Zeiler and Floria Zeiler, docket No. 15477-80.↩
2. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. Most of these cases have some issues other than the claimed deduction of a loss from L.C. Properties Partnership. However, this case was tried only on the severed issue of whether each petitioner is entitled to a claimed partnership loss from L.C. Properties Partnership, which depends on whether L.C. Properties Partnership is entitled to its claimed interest deductions and, in one year, a small bank charge deduction claimed with respect to alleged loans to the partnership.↩
4. Over 1,000 exhibits were stipulated into the record by the parties. The stipulation in many instances was that "the parties specifically reserve to the Court the question of the substance as opposed to the form of" certain stipulated documents. Therefore, in finding the facts as stipulated we have found the documents as stipulated to be the documents described, but have not by this finding found the substance of the documents to be necessarily the same as the form. Where we consider it necessary to decide with respect to the substance as compared to the form of a document, we will include such a finding in our findings of fact or will consider the issue in our opinion. The parties also stipulated with respect to many accounting records of various persons and entities only that the documents were records maintained by that person or entity but reserved to the Court the question of whether the records reflected actual substantial transactions. In finding the facts as stipulated, we find only that these records were maintained and, as stated above with respect to stipulated documents, do not find whether these records reflect the substance of the transaction purported to be recorded.↩
5. The date the partnership agreement was signed by or on behalf of each of the persons denominated as a partner is unclear from the record. The data "10/15/75" appears next to the signature of Norman Leonard. The signing on behalf of the trust partners was by Mr. Harry Margolis or an employee in his offices. The signing on behalf of the corporate partners was in each instance by an employee in the offices of Mr. Harry Margolis. ↩
6. The records of L.C. Properties Partnership show under capital accounts for each person listed as a partner in the partnership under data of December 31, 1974, the amount listed by that partner's name in the partnership agreement plus some small additional amounts. The cash receipts and cash disbursements journals for L.C. Properties Partnership for the month of December 1974 show the following cash transfers to and from the partnership's Barclays Bank of California account: ↩
Cash
Received
Date
Cash
Disbursed
Date
Received
From
Received
Disbursed
To
Disbursed
$30,000
Meyer
12/26/74
$5,000
Erhard
12/26/74
Zeiler
Trust
500
Margolis
12/26/74
110,000
Harry
12/26/74
Chatzky &
Margolis,
Dunnett
Trustee
95,000
Erhard
12/26/74
10,000
Harry
12/26/74
Trust
Margolis,
Trustee
20,000
Erhard
12/26/74
10,000
Harry
12/26/74
Trust
Margolis,
Trustee
20,000
Meyer
12/26/74
Zeiler
20,000
Michael
12/26/74
70,500
Harry
12/27/74
Gurdin
Margolis,
Trustee
10,000
Robert
12/26/74
50,000
Harry
12/27/74
Muehlenbeck
Margolis,
Trustee
10,000
Patsey
12/26/74
Trust
500
Margolis,
12/26/74
50,000
Harry
12/27/74
Chatsky &
Margolis,
Dunnett
Trustee
44,000
Gladstein
12/26/74
15,000
Harry
12/28/74
Trust
Margolis,
Trustee
15,000
Andersen
12/26/74
10,000
N.Leonard
12/28/74
Trust
10,000
N.Leonard
12/26/74
293,000
Harry
12/28/74
Margolis,
Trustee
39,000
Leonard
12/26/74
25,000
ABL
12/30/74
Trust
210,000
ABL
12/26/74
50,000
Frank
12/27/74
Robinson
50,000
Thomas
12/27/74
Scortia
25,000
Edward
12/30/74
Thorp
$649,00
$648,500
7. Hexagram N.V. was a corporation operated from an office in Panama. The note for $3,500,000 signed on behalf of L.C. Properties Partnership in favor of WE was shown on a document contained in L.C. Properties Parnership's records as having been assigned to Hexagram N.V.↩
*. ADC are the initials for Anglo Dutch Capital Co. ADC was a corporation owned by Harry Margolis which came into existence in 1963 and was active as a finance company from 1966 through 1973 or 1974. Mr. Margolis served as the chief executive officer of ADC. ADC, in the function it served, was a predecessor of ABL and served the same function as a source of money for various clients and operations of Mr. Margolis, as was later served by ABL.↩
17. During a period of less than 48 hours, on Dec. 16 and 17, 1969, the $600,000 moved (1) from Union Bank to petitioner's checking account in that bank; (2) to World Minerals' account at Banco Popular; (3) to Alms' account at Banco Popular; (4) to petitioner's account at Union Bank; and (5) back to Union Bank to repay its loan. ↩
18. In fact, a presumption to the contrary may well exist. Before the second trial session of this case, respondent requested that petitioner produce the authorization forms prepared by the Margolis office in connection with the December 1969 and November 1970 money movements. Petitioners' counsel indicated that these forms would be made available if they could be located. Although these documents would have indicated the reason (if any) for the World Minerals-Alms transfer, despite respondent's repeated requests, the documents have not been provided to the Court. Neither has petitioners' counsel unequivocally stated that they did not exist. Where a party fails to produce a document within his possession which his opponent contends is probative, a presumption arises that if produced, the document would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 213↩ (10th Cir. 1947); 2 J. Wigmore, Evidence, sec. 291 at 180 (J. McNaughton rev. 1961).
8. We have not ignored the fact that the records of Roselisa Corp.'s account at Barclays Bank of California show cash disbursements to each of the partners of L.C. Properties Partnership. However, the funds for the disbursements apparently came from Mr. Harry Margolis through his corporation, ADC. The record is clear that the Barclays Bank of California account of Roselisa Corp. and the other entities here involved was controlled by Mr. Margolis. Therefore, in our view these disbursements did not in substance represent payments by Roselisa Corp. The record indicates that most, if not all, the funds stated to have been paid in by the partners of L.C. Properties Partnership may have come from Mr. Margolis or an entity which he controlled. (see n.5 supra). In our view, the entry concerning Roselisa Corp.'s payments to partners of L.C. Properties Partnership was merely a return to an entity controlled by Mr. Margolis of funds previously advanced. However, it does appear that to the extent the year 1976 is involved for any petitioner, adjustment should be made to reflect our disallowance of claimed losses in prior years to the extent such disallowance would reduce 1976 income.↩